IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

PATRICK WAYNE SETTLE,

      Plaintiff,

v.                                CASE NO. 2:10-cv-00559

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the court on cross-briefs for judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Patrick Wayne Settle (hereinafter referred to as "Claimant"), filed an application for SSI on June 15, 2007, alleging disability as of April 1, 2003, due to illiteracy, scoliosis, back/neck/right shoulder/leg pain, migraines, multiple sclerosis of the brain, bi-polar, short term memory loss, muscle spasms, vision problems, hearing loss in left ear, and stomach

pain/acid reflux.[1]  (Tr. at 16, 138-43, 165-73, 196-202; 215-21.)
The claim was denied initially and upon reconsideration.  (Tr. at
16, 94-98; 101-03.)   On August 20, 2008, Claimant requested a
hearing before an Administrative Law Judge ("ALJ").  (Tr. at 107-
10.)   The hearing was held on September 25, 2008 before the
Honorable Valerie A. Bawolek.  (Tr. at 33-71, 114.)   By decision
dated December 1, 2008, the ALJ determined that Claimant was not
entitled to benefits.  (Tr. at 16-32.)  The ALJ's decision became
the final decision of the Commissioner on March 22, 2010, when the
Appeals Council denied Claimant's request for review.  (Tr. at 1-
4.) On April 22, 2010, Claimant brought the present action seeking
judicial review of the administrative decision pursuant to 42
U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a
claimant for disability benefits has the burden of proving a
disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir.
1972).  A disability is defined as the inability "to engage in any
substantial gainful activity by reason of any medically

---

[1]  On November 9, 2000, Claimant filed an application for SSI,
alleging disability beginning September 1, 1987.  The claim was denied
on March 12, 2001, and Claimant did not appeal the determination.   On
August 12, 2003, Claimant filed an application for SSI, alleging
disability beginning April 1, 2003.   The claim was denied initially on
March 29, 2004, and on reconsideration on May 14, 2004.  Claimant
requested a hearing, which was held on March 7, 2006.  The ALJ issued
an unfavorable decision on May 26, 2006.  Claimant requested Appeals
Council review but was denied on July 26, 2006.  Claimant did not
pursue further appeal of this claim.  On June 15, 2007, Claimant
protectively filed his current application for SSI.

determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2010).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental

capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2010).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.   McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 18.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of back strain and borderline intellectual functioning. (Tr. at 18-22.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22-24.)   The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations. (Tr. at 24-31.)  Claimant has no past relevant work. (Tr. at 31.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as hand packer, sweeper/cleaner, and motel cleaner which exist in significant numbers in the national economy. (Tr. at 31-32.) On this basis, benefits were denied. (Tr. at 32.)

Scope of Review

The sole issue before this court is whether the final decision

4

of the Commissioner denying the claim is supported by substantial evidence.    In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Cellebreze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   <u>Hays v.Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was twenty-six years old at the time of the administrative hearing.   (Tr. at 37.)   He has a tenth grade education, which included one year of vocational/technical education in auto mechanics.   (Tr. at 39, 271.)   In the past, he has worked at a "few odd jobs" but has never tried to get regular

5

employment.  (Tr. at 40.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

On February 27, 2004, Claimant had a lumbar spine x-ray at Montgomery General Hospital.  (Tr. at 262.)  Kenneth Dwyer, M.D., radiologist, stated: "AP and lateral views of the lumbar spine demonstrate normal alignment.  The lumbar disc spaces are maintained.  There is no evidence for fracture.  The SI joints are intact. IMPRESSION: NORMAL LUMBAR SPINE."  Id.

On March 7, 2004, Nilima Bhirud, M.D., provided a Disability Determination Evaluation of Claimant.  (Tr. at 258-61, 263-64.)  Dr. Bhirud stated that Claimant "gives a history of backache, neck pain, left shoulder pain, left ankle pain, and bipolar disorder."  (Tr. at 259.)  Dr. Bhirud reached these conclusions:

> PHYSICAL EXAMINATION:
> GENERAL: The claimant could pick up a coin from the floor.  The claimant could stand on each foot at a time.  The claimant could do heel-walking, toe-walking and squatting.  The claimant's gait was normal.  He could walk in tandem gait.  He was not using any ambulatory aids.  He was comfortable in sitting and standing position...
>
> EYES: The pupils are equal, round and reactive to light and accommodation...
>
> EARS:  Normal...
>
> CENTRAL NERVOUS SYSTEM: Oriented times three.  Central nerves normal.  No sensory or motor deficit.  Reflexes

6

2+, symmetrical...

MUSCULOSKELETAL SYSTEM: Cervical spine reveals no tenderness and range of motion is normal.  Thoracic spine reveals scoliosis of thoracic spine with convexity to the right.  Lumbar spine reveals no tenderness and range of motion normal.  Straight leg raising is negative on both sides...

VISUAL ACUITY: Without glasses, right 20/40, left 20/50...

ASSESSMENT: The claimant is 21-year old male who gives history of neck pain and backache.  At the time of the examination, there was no tenderness over the C-spine or lumbar spine.  He has a history of scoliosis of thoracic spine.  He has tenderness over the left shoulder but the range of motion was normal.  The left ankle, he had tenderness but the range of motion was normal.  He also gives a history of bipolar disorder and split personality.  He needs to see a psychiatrist for that.

(Tr. at 259-60.)

Records indicate Claimant was treated by Karen Hultman, D. O. on seven occasions: November 9, 2004, November 23, 2003, January 27, 2005, March 3, 2005, May 10, 2005, June 23, 2005 and July 20, 2005.  (Tr. at 230-35, 248-57.)

On November 9, 2004, Dr. Hultman reported:

Dx with scoliosis a few years ago by a doctor at New River Health Center; has back pain all the time; was in car accident in 1998 that gives him right shoulder and neck pain; this also contributes to the back pain...

Physical Examination:  Alert and oriented in no acute distress.  Vital signs are stable.  Afebrile [normal temperature]. Right leg is about ½ inch shorter than left; minimal muscle spasm is noted in the thoracic paravertebral muscles.  There is a full Range of Motion to the thoracic spine. Sensation of the upper and lower extremities is intact. Muscle strength is 2/4 and equal bilaterally.  DTR [deep tendon reflex] are 2/4 and equal bilaterally.  There is tenderness to palpitation

7

throughout the thoracic spine bilaterally.  There is no
point tenderness.  No deformity is noted. ++ scoliosis is
noted.  The lumbar spine shows a full range of motion.
There is no deformity and no point tenderness.  DTR are
2/4 and equal bilaterally.  Sensation is equal and
adequate bilaterally.  Muscle strength is equal.
Dorsiflexion of the great toe is equal and adequate.
Dorsiflexion of the foot is equal.  There is a negative
straight leg raising test bilaterally both sitting and
lying.  There is generalized muscle spasm noted
throughout the lumbar spine paravertebral muscles.

Assessment: scoliosis, arthritis, short leg.

Plan: Shoe lift start with 1/4 lift; daypro; recheck in
two weeks; RTC [return to clinic] if no improvement or
any problems.

(Tr. at 256-57.)

On November 23, 2004, Dr. Hultman reported:

Physical Examination: Alert and oriented in no acute
distress...Minimal muscle spasm is noted in the thoracic
paravertebral muscles.  There is full Range of Motion to
the thoracic spine...The lumbar spine shows a full Range
of Motion.  There is no deformity and no point
tenderness...There is a negative straight leg raising
test bilaterally both sitting and lying.  There is
generalized muscle spasm noted throughout the lumbar
spine paravertebral muscles.

Assessment:  gerd  [gastroesophageal  reflux  disease],
Scoliosis, thoracic strain, lumbar strain, short leg.

Plan: Zantac, lortab, TRC if no improvement or any
problems.

(Tr. at 254-55.)

On January 27, 2005, Dr. Hultman stated that Claimant was

complaining of right shoulder and right wrist pain from a "previous

injury" and that she was ordering x-rays.  (Tr. at 252.)

On February 7, 2005, Dr. Hultman stated that a radiology

8

report of claimant's right shoulder and right wrist were normal.
(Tr. at 250.)

On March 3, 2005, Dr. Hultman reported:

Physical Examination:  X-ray reviewed: Normal.
Does not appear hyper.  Appears very calm is slumped in
the chair relaxed.  Does not appear to be in any pain
today.  Alert and oriented in no acute distress...

The lumbar spine shows a full range of motion.  There is
no deformity and no point tenderness...There is negative
straight leg raising test bilaterally both sitting and
lying.  There is minimal if any muscle spasm noted
throughout the lumbar spine paravertebral muscles...No
scoliosis is noted.

Assessment:   Patient   thinks   he   has   ADHD   [attention
deficit hyperactivity disorder]; I see no evidence today.
Back pain, low grade sprain, prob [probably] due to lack
of exercise and poor posture.

Plan: refer to psyc [psychiatrist] for possible ADHD;
physical  therapy;  iodine  bid;  back  care  book  and
exercises; RTC if no improvement or any problems.

(Tr. at 248-49.)

On May 10, 2005, Dr. Hultman reported:

Patient reports that he has low back pain – pain scale 8-
9 - things that help pain was Lortab...headaches every
day but says just started 304 days ago...

Physical Examination:  Alert and oriented in no acute
distress...The lumbar spine shows a full range of motion.
There is no deformity and no point tenderness.  DTR are
+2/4 and equal bilaterally.   Sensation is equal and
adequate bilaterally.   Muscle strength is equal.
Dorsiflexion of the great toe is equal and adequate.
Dorsiflexion of the foot is equal.  There is a negative
straight leg raising test bilaterally both sitting and
lying.    There  is  generalized  muscle  spasm  noted
throughout the lumbar spine paravertebral muscles.  Head
is normocephalic.  Eyes are PERLA [normal oculomotor
functions],  EOMI  [extraocular  movements  intact].
Fundoscopic  is  normal.    Hearing  is  adequate.

9

Neurovascular examination is intact.

Assessment: cephalgia [headache], doubt migraine; ls [lumbar spine] strain; poss [possibly] drug seeking

Plan: call board of pharmacy and see if he is getting medication elsewhere; schedule for physical therapy; relafen, norflex, small amount of lortab; RTC if no improvement or any problems.

(Tr. at 234-35.)

On May 17, 2005, Jack Henry, D.C., Spinal Imaging, Inc., reported to Dr. Mike Kominsky that an x-ray of Claimant's cervical, thoracic, and lumbar spine showed "spinal biomechanical alterations." (Tr. at 237-38.)

On June 23, 2005, Dr. Hultman reported:

Physical Examination: Alert and oriented in no acute distress....Lumbar spine shows a full Range of Motion. There is no deformity and no point tenderness...There is a negative straight leg raising test bilaterally both sitting and lying. There is generalized muscle spasm noted throughout the lumbar spine paravertebral muscles...

Assessment: ls strain; rule out disc ds [disease].

Plan: MRI lumbar spine; after MRI will get pain clinic referral; Rx [prescription] refills written; add neurontin.

(Tr. at 233.)

On July 20, 2005, Dr. Hultman reported that Claimant

reports that his current dosage of meds helps but doesn't knock out the pain completely; wants to know if his pain medication can be increased; pain is mid to low back; wants an opinion on whether or not he is disabled because DHHR case worker is asking him about it; worker Connie Wallace told him yesterday that he needs to get a job; reports that he wants to work but pain is too severe...

10

Physical Examination: Alert and oriented in no acute distress...Minimal muscle spasm is noted in the thoracic paravertebral muscles.  There is full Range of Motion to the thoracic spine...There is no point tenderness.  No deformity is noted.  No scoliosis is noted.  The lumbar spine shows a full Range of Motion.  There is no deformity and no point tenderness...There is a negative straight leg raising test bilaterally both sitting and lying.  There is generalized muscle spasm noted throughout the lumbar spine paravertebral muscles.

Assessment: thoracic strain; lumbar strain.

Plan: zonegran, lortab; [I] recommend he find another Dr. We disagree on the lortab.

(Tr. at 230-32.)

On December 5, 2005, Dr. Henry reported to Dr. Mike Kominsky that an x-ray of Claimant's lumbar spine showed: "1) Spinal biomechanical alterations noted.   2) Spondylolytic spondylolisthesis at the L5 level on S1 of approximately five percent." (Tr. at 236.)

On January 11, 2006, Jennifer Boyd, PA-C [physician's assistant-certified] stated that Claimant visited New River Health Association to establish care at that facility:

**CC** [chief complaint]: Back pain, jaw pain, and bipolar disorder.

**HPI** [history of the present illness]: This gentleman is wishing to establish care here for chronic medical problems, including back pain that started in 1998 after an MVA [motor vehicle accident] in which he was thrown against the dashboard.  Did not lose consciousness, but has suffered thoracic and lumbar pain ever since then...Treated by Dr. Kominsky...He saw Karen Hultman for a time for medication.  States...Lortab was the only thing that helped.  He tried to get her to increase it to 2 tabs, and his understanding is that he was discharged from care at that time.  He had a tooth pulled recently

11

and feels that his jaw might have been pulled or strained at that time...Finally, he states that he was seen at FMRS in 10-05 and diagnosed with bipolar disorder...

**Review of Systems**: Positive for occasional radiation of pain down the legs. Negative for weakness. Positive for headaches...

**Impression**: Depression - 311.  Thoracic and lumbar strains.

**Plan**: I recommended that we will not be treating him with narcotics given that he is transferring care from another provider, and he has a history of depression...He agreed to try an anti-depressant and, in fact, requested it.

(Tr. at 229.)

On May 23, 2007, Claimant presented to the Raleigh General Hospital Emergency Room ["ER"] "complaining of numbness to the right side of his face an [sic; and] to the left side of his body." (Tr. at 279.)

On May 24, 2007, Fred P. Tzystuck, M.D. noted:

He says that two days ago he had a mild headache, which he describes as a migraine...The patient states that he follows a regular physician for this, and she gave him "migraine medication".  This completely relieved his pain; however, the patient states that after his headache had gone away, he developed these odd tingling sensations on the right side of his face and the left side of his body.  Denies any weakness, fevers, chills, and denies any current headache.  Denies any nausea, vomiting, or chest pain.

On physical examination, the patient has no objective findings.  His tactile discrimination is less than 2 mm bilaterally.  Reflexes are 2+ bilaterally.  Strength is 5/5 bilaterally throughout all extremities.  Cerebellar function appears to be intact.  He has no truncal or gait ataxia.  Rapid alternating hand movements are within normal limits.  He has no dysdiadochokinesia.

I discussed the CT findings with Dr. Reeseman, who said

12

that there is some evidence of a demyelination in the
posterior horns of the ventricles and the parenchyma just
behind the ventricles.  He says that this needs to be
further evaluation with an MRI.  I discussed the case
with Dr. Dy, who agrees to follow up with the patient as
an outpatient, agreeing to see him tomorrow...The patient
denies any pain to me.  Denies any signs or symptoms that
would suggest subarachnoid hemorrhage, etc.  The patient
is afebrile.  Negative Kernig's and Brudzinski's.

(Tr. at 279-80.)

On May 24, 2007, Henry L. Setliff, M.D. reviewed Claimant's CT

brain scan without contrast.  Dr. Setliff concluded:

There are no CT signs of intracranial hemorrhage, a mass,
or midline shift.  Ventricular caliber is normal.  There
is no calvarial fracture.  Mucoperiosteal thickening
involves the ethmoid air cells and both maxillary antra.
The frontal sinuses are minimally involved, as are the
spenoid sinuses.  Impression: Unenhanced CT examination
of the brain demonstrates evidence of mild pansinusitis.
Intracranially, the study is negative.

(Tr. at 283.)

On May 31, 2007, Robert Smith, M.D., Plateau Medical Center,

reviewed Claimant's MRI of the brain with and without contrast.

(Tr. at 301-02.)  He concluded: "Impression: Periventricular and

subcortical foci of signal intensity changes, most consistent with

demyelinating white matter disease, most likely multiple sclerosis.

No evidence for active white matter demyelination at the time of

this study."  (Tr. at 302.)

On June 22, 2007, Barry Vaught, M.D. stated that Claimant had

been referred to him by Mariana Didyk, PA-C, New River Health

Association, for evaluation following an abnormal MRI scan:

In trying to elicit a history of symptoms suggestive of

13

multiple sclerosis, Mr. Settle does not describe many
lateralizing neurological abnormalities.  He denies any
history of vision loss.  He has had very brief periods of
left arm numbness...He does describe a long history of
short term memory loss...He does report using marijuana,
cocaine, Percocet, and hydrocodone in the past but says
that marijuana is the only drug that he is currently
using.

(Tr. at 295.)

On July 7, 2007, Claimant underwent testing by at Charleston

Area Medical Center.   (Tr. at 285-91.)   Kuravilla John, M.D.,

stated in a neurodiagnostic report to Barry Vaught, M.D.: "The

responses are within normal limits.  Normal study."  (Tr. at 291.)

On July 24, 2007, Dr. Vaught stated that Claimant

is complaining of multiple episodes of blurred and double
vision which he states have been present for the last 2-3
weeks...Later in the interview, he states that this has
been present for years.  An accurate history is difficult
to obtain as he states different time lines for the
presence of blurred and double vision.  His mother is in
the room with him today and states that Dr. Janey, an
opthalmologist in Oak Hill, has suggested that Mr. Settle
has glaucoma, yet Dr. Janey does not believe that it is
advanced enough to treat.

(Tr. at 293.)

On August 3, 2007, Dr. Vaught diagnosed Claimant with

"demyelinating central nervous system" stating:

In reviewing his history, I cannot find any particular
episodes that sound suggestive of multiple sclerosis
attack...His neurological examination is essentially
normal except for mildly exaggerated HIPAs that I cannot
be certain that is bilateral afferent pupillary defects.
Otherwise, his neurological examination was normal...For
now, we will not consider any further medication, but
instead try to seal up an accurate diagnosis before
proceeding.

14

(Tr. at 297.)

On September 4, 2007, Mariana Didyk, PA-C, New River Health Association, stated:

> Patrick comes back in today stating...he never went back for his second attempt at spinal tap to try and help diagnose his condition to see if this really is MS or not. He evidently tried a number of times to ask Dr. Vaught for pain medication. Dr. Vaught declined. He wanted strong pain medication...I have confronted Patrick today with the fact that I think he knows why Dr. Vaught refused him the pain medication but he denies any knowledge of this. After I asked his mother to leave the room, I tell him that there was a note in Dr. Vaught's report stating that he had admitted to using cocaine, Percocet, Lortab and other narcotics illegally and that we do not prescribe narcotic pain medication to people who have this kind of a history...I have also really emphasized today to Patrick that he needs to get the spinal tap done so that we can come up with a diagnosis for his condition to know how to treat it. Otherwise, we are left only with prescribing pain medication which is not a good answer to his situation. He voices understanding but does not agree that this is the problem and states that he will think about rescheduling for a spinal tap but he is not sure he will do it.

(Tr. at 387.)

On November 14, 2007, Marcel Lambrechts, M.D. stated in a form titled Case Analysis: "Even though he was found to have MS [multiple sclerosis] it is not severe at this time and he is not restricted yet. No changes needed in the completed RFC." (Tr. at 323.)

On November 19, 2007, Dr. Lambrechts stated in a form titled Case Analysis: "I would feel better if we got a CE [clinical evaluation] with ROM [range of motion] now as he has had much new info for the past several months. It probably will still be non

15

severe but it could change suddenly." (Tr. at 326.)

On October 11, 2007, Christina M. Cavozos, M.D. stated: "Left shoulder, three views...There is no fracture or dislocation." (Tr. at 300.)

On December 6, 2007, a State agency medical source completed a physical examination report regarding Claimant. (Tr. at 328-38.) The evaluator, Serafino S. Maducdoc, Jr., M.D., reached these conclusions regarding Claimant: "This 25-year-old male, white, single has migraine headaches, peptic ulcer disease, and bipolar disorder with chronic depression and anxiety state. He also has learning disability and possibly has multiple sclerosis." (Tr. at 331.)

On December 17, 2007, a State agency medical source completed a physical residual function capacity assessment of Claimant. (Tr. at 339-46.) The evaluator, Marcel Lambrechts, M.D. stated that Claimant's primary diagnosis was "possibly M.S. early" and the secondary diagnosis was "migraine, back, right shoulder pain." (Tr. at 339.) He concluded that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit about 6 hours in an 8-hour workday, and had an unlimited ability to push and/or pull (including operation of hand and/or foot controls). (Tr. at 340.) Dr. Lambrechts found that Claimant could frequently do all the postural limitations with the exception of balancing and stooping, which he opined Claimant

could do occasionally.  (Tr. at 341.)  He found Claimant had no manipulative, visual, or communicative limitations.  (Tr. at 342-43.)  Claimant had no environmental limitations save to avoid concentrated exposure to temperature extremes, fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. at 343.)  Dr. Lambrechts concluded:

> I have reviewed the ALJ decision and the current CE and
> it does not show a severe disability.  He may have early
> signs of M.S. and other minor problems but it does not
> seem severe.  I feel that he could work if he wanted to
> and he should be able to do medium work.  RFC is as
> noted.

(Tr. at 344.)

On February 25, 2008, Joan Worthington, D.O., New River Health Association, states Claimant "reports having had a history of migraine headaches, low back pain and scoliosis...Not taking any meds at this time...In no acute distress...Opiate contract." (Tr. at 386.)

On March 10, 2008, a State agency medical source completed a physical residual function capacity assessment of Claimant.  (Tr. at 347-55.) The evaluator, Rabah Boukhemis, M.D. stated that Claimant's primary diagnosis was "MS ?" and the secondary diagnosis was "back pain." (Tr. at 347.)  He concluded that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit about 6 hours in an 8-hour workday, and had an unlimited ability to push and/or pull (including operation of hand and/or foot controls).  (Tr. at 348.)

17

He commented: "presumptive MS but no new evidence of neuro worsening.  Back pain, old spondylolisthesis likely."  <u>Id</u>.  Dr. Boukhemis found that Claimant could frequently do all the postural limitations with the exception of climbing and crawling, which he opined Claimant could do occasionally.  (Tr. at 349.)  He found Claimant had no manipulative, visual, or communicative limitations.  (Tr. at 350-51.)  Claimant had no environmental limitations save to avoid concentrated exposure to temperature extreme heat, humidity, vibration, hazards, and fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. at 351.)  Dr. Boukhemis commented regarding Claimant's symptoms: "Main complaints pain, MS ? Paresthesia. Mostly credible."  (Tr. at 352.)

On June 18, 2008, Dr. Worthington stated that Claimant "here for two physical exam forms to be filled out, one is a DHHR physical, the other is for his lawyer, Mr. Shumate...In no acute distress...Impression: Chronic low back pain...I've also filled out the physical forms limiting his lifting...Opiate contract."  (Tr. at 385.)

On June 18, 2008, Dr. Worthington filled out a form titled: West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical (Adults).  (Tr. at 382-84.)  She checked "normal" for all areas except "psychiatric" (which she left blank) and "orthopedic" wherein she handwrote: "Limited ROM forward bending, rotation & extension."  (Tr. at 383.)  Her diagnosis:

18

"Major: Chronic low back pain; Minor: Depression/Insomnia." <u>Id</u>. She marked "No" to the questions "Is applicant able to work full-time at customary occupation or like work?"; "Is applicant able to perform other full time work?" and "Should applicant be referred for vocational rehabilitation?" (Tr. at 383-84.) In response to the question: "What work situations, if any, should be avoided?" Dr. Worthington responded: "Lifting more than 10-15 lbs." (Tr. at 383.)

On June 18, 2008, Dr. Worthington also filled out a form titled: "Medical Assessment of Ability to do Work-related Activities (Physical)." (Tr. at 389-93.) She marked that Claimant could occasionally and frequently lift/carry 15 pounds; stand/walk for 2 hours, 45 minutes without interruption; and sit for 1-2 hours in an 8-hour workday, 20 minutes without interruption. (Tr. at 389-90.) She opined that Claimant could never climb, balance, stoop, crouch, or crawl, but could occasionally kneel. (Tr. at 390.) She marked that Claimant's reaching, handling, feeling, seeing and hearing were affected by his impairment, but that his pushing/pulling and speaking were not affected. (Tr. at 391.) His only environmental restrictions were heights and moving machinery. <u>Id</u>.

On June 26, 2008, Dr. Worthington stated in office notes that Claimant visited because "he is feeling crawling sensations on himself and has nerve problems." (Tr. at 394.) She diagnosed

19

"anxiety" and "chronic low back pain." Id.  She noted his opiate contract and prescribed Zantac 150, Flexeril 10 mgs, and Naprosyn, 500 mg.  Id.

On September 8, 2008, Dr. Worthington's office notes state that Claimant

> is here for refills...He reports falling down 4 steps, caught himself on his left elbow and struck his back on the left side as well the other day...He currently is not working.  He baby-sits his two-year-old and five-month-old...Impression: Low back strain/sprain, possible rib contusion...
>
> Plan: I will have him return with his Hemoccult cards to the lab.  Urine specimen tomorrow.  X-ray on left back ribs and thoracic spine tomorrow.  MRI on 09/12/08 at PMC [Plateau Medical Center].  This is for the lumbar/chronic back pain.  Zantac 150...Flexeril 10 mg...have given him samples of Celebrex 200 mg...Prevacid 30 mg...Opiate contract...Naprosyn 500 mg.

(Tr. at 395.)

On September 11, 2008, Benjamin Strong, M.D., Plateau Medical Center, stated in a radiology report for an MRI of Claimant's Lumbar Spine:

> There is no evidence of spinal canal narrowing.
> The conus medullaris is normal.
> There is no evidence of epidural masses or hemorrhage.
> The visualized portions of the sacroiliac joints are
>  unremarkable.
> The facet joints are normal.
> The extraspinous soft tissues are normal.
> The visualized intra-abdominal structures are normal.
>
> IMPRESSION: Bilateral L5-S1 spondylolysis, with no evidence of spondylolysis.  No significant disc degeneration.

(Tr. at 398.)

20

On April 27, 2009, May 4, 2009, and May 18, 2009, Claimant had office visits with Serafino S. Maducdoc, Jr., M.D.  (Tr. at 399-402.) The notes are handwritten and largely illegible.  Legible words are "chronic lumbo-sacral strain...insomnia...anxiety... psoriasis of both knees."  Id.

Psychiatric Evidence

On April 15, 1991, David G. Sweet, Ed. S., Certified School Psychologist, did a psychological evaluation of Claimant (nine years old) for the Fayette County Board of Education.  (Tr. at 274-76.)   Dr. Sweet gave Claimant the WISC-R test and concluded: "Patrick obtained a Full Scale IQ of 76 ...which suggests that his overall level of cognitive functioning is in the Borderline range." (Tr. at 275.)

On January 17, 2001, Tim Brooks, M.A., Licensed Psychologist, and Kelly Melvin, M.Ed., Supervised Psychologist, provided an Adult Mental Profile of Claimant.  (Tr. at 270-73.)  In the report, they made these findings:

> **Mental Status Examination**: Mr. Settle arrived at the interview on time.  Dress and grooming appeared casual and within the borderline range.  Mr. Settle was dressed in a dirty t-shirt with denim coveralls and was wearing boots.   His posture was slouched and his gait was unremarkable...His attitude was not motivated.   Mr. Settle made intermittent eye contact throughout the interview and his verbal responses were usually one to two words in length.  He was able to carry on a conversation, but introversion was noted.  Mr. Settle's speech was relevant and coherent, but the pace was slow. Mr. Settle was alert and oriented to person, place and time.  He was not able to state a reason for why he was at the interview, however...Mr. Settle's mood was judged

21

to be euthymic, but his affect was restricted.  There was no evidence of unusual thought processes, and his thought content was unremarkable.  Mr. Settle denied experiencing hallucinations or illusions.  Mr. Settle's insight appeared to be limited.  His judgment was moderately deficient based upon his comprehension scaled subtest score.  Mr. Settle denied past or present suicidal ideation.  Mr. Settle denied past or present homicidal ideation.  Immediate memory is normal, as Mr. Settle was able to recall four of four items immediately.  However, recent memory was markedly deficient as he was able to recall only one of four items after 15 minutes.  Remote memory appeared to be mildly impaired, as he was a poor historian.  He was unable to give many dates and description of events were often vague.  Concentration appeared to be within normal limits, as he was able to give serial 3's with one mistake.  Psychomotor behavior was unremarkable.  During the evaluation Mr. Settle was both quiet and reserved.

**Intellectual/Achievement Assessment**: WAIS-III results -

| IQ Scale | Score | Index | Score |
|---|---|---|---|
| Verbal IQ | 71 | Verbal Comprehension | 72 |
| Performance IQ | 72 | Perceptual Organization | 78 |
| Full Scale IQ | 69... | | |

WRAT-III results -

| Subject | Standard Score | Grade Level |
|---|---|---|
| Reading | 76 | 4 |
| Spelling | 69 | 4 |
| Arithmetic | 68 | 4 |

**Validity**: Obtained scores are considered valid, but a low estimate of Mr. Settle's optimal cognitive function capabilities...He has a history of full-time special education placement due to self-reported reading and writing difficulties...Obtained achievement scores are consistent with IQ scores...

**Diagnoses** (using DSM-IV criteria):
Axis I V71.09  No diagnosis
Axis II V62.89 Borderline intellectual functioning
Axis III  Shoulder pain, back pain, knee pain, as reported by claimant.
**Capability Statement**: It is my opinion that Mr. Settle is presently capable of managing any awarded money in his own best interests.

22

(Tr. at 271-73.)

On January 16, 2004, Dale M. Rice, M.A., Licensed Psychologist, and Kelly Rush, M.A., Supervised Psychologist, provided a psychological evaluation of Claimant. (Tr. at 265-69.) They made these general observations during the clinical evaluation: "He walked with a normal gait and maintained a slouched posture...He has no apparent vision or hearing problems...No speech problems were noted...He was appropriate and related fairly well...He reports learning problems...difficulty reading instructions, filling out paper work and reading a newspaper." (Tr. at 265-66.) Their findings for the Mental Status Examination were:

**Orientation** - He was alert throughout the evaluation. He was oriented to person, place, time and date.
**Mood** - Observed mood was dysphoric.
**Affect** - Affect was mildly restricted.
**Thought Processes** - Thought processes appeared logical and coherent.
**Thought Content** - There was no indication of delusions, obsessive thoughts or compulsive behaviors.
**Perceptual** - He reports no unusual perceptual experiences.
**Insight** - Insight was fair.
**Judgment** - Moderately deficient based on his response to the finding the letter question. He stated "hand it to the person."
**Suicidal/Homicidal Ideation** - He denies suicidal and homicidal ideation.
**Immediate Memory** - Immediate memory was within normal limits. He immediately recalled 4 of 4 items.
**Recent Memory** - Recent memory was moderately deficient. He recalled 2 of 4 items after 30 minutes.
**Remote Memory** - Remote memory was within normal limits based on ability to provide background information.
**Concentration** - Concentration was within normal limits based on his ability to do serial 3's.
**Psychomotor Behavior** - Normal.

23

**DIAGNOSTIC IMPRESSION**
**AXIS I:**   V71.09      No Diagnosis
**AXIS II:**  V62.89      Borderline Intellectual Functioning
                         (By Record)
**AXIS III:** By self report: back, left shoulder and neck
             problems and headaches.

**RATIONALE**
Mr. Settle was given the diagnosis of Borderline
Intellectual Functioning (By Record) based on the
following criteria: a history of a valid FSIQ of 76.

**DAILY ACTIVITIES**
Typical Day: Mr. Settle goes to bed at 10:00 p.m. and
gets up at 12:30 p.m. He gets up, takes a shower, visits
with his brother, watches tv, eats, talks with his
brother, watches tv, goes home, listens to the radio,
talks to his girlfriend and goes to bed...

**SOCIAL FUNCTIONING.**..within normal limits based on his
interaction with the examiner.
**CONCENTRATION.**..within normal limits based on his ability
to do serial 3's.
**PERSISTENCE.**..within normal limits based on the mental
status examination.
**PACE.**..within normal limits based on the mental status
examination.
**CAPABILITY TO MANAGE BENEFITS**
Mr. Settle appears capable to manage any benefits he
might receive.
**PROGNOSIS:** Fair.

(Tr. at 267-68.)

On March 24, 2005, Shivkumar L. Iver, M.D., Psychiatrist, FMRS

Health Systems, Inc., provided a psychiatric evaluation of

Claimant:

IDENTIFYING INFORMATION
Patient is a 22 year old white male who presents to the
clinic complaining of symptoms of Attention Deficit
Disorder {"ADD"]. Patient's history is vague and patient
contradicts himself frequently during the interview.
Patient reports that he did not have symptoms of ADD much
as a child, but currently his symptoms of ADD have gotten

24

worse especially after he allegedly got electrocuted why [sic; while] he was working in a friend's house. Patient's symptoms are inconsistent.  Patient reports poor attention span and says that he cannot concentrate; however, patient told the therapist during intake that he has symptoms of depression and was having hallucinations. During this interview patient denies this and says his mood is euthymic and his energy level is fair.  Patient denies any neurovegatative symptoms of depression. Patient admits to using marijuana at least three times a week for the past few years.  When asked if he would like to take treatment for that, patient denies it.  Patient appeared to be medication seeking and said the only medicine that he feels would help him would be something for ADD.  When patient was offered Strattera patient reported that he has glaucoma and he has read that he cannot take Strattera if he has glaucoma.  When patient was asked to produce a medical report about his glaucoma he started to get vague and evasive.  Patient subsequently stated that he needed Adderall for his treatment.  Patient was informed that Adderall was a psychostimulant and that it cannot be given as he is abusing marijuana at present.  Patient started to get defensive when informed of this...

Patient has lost his drivers license in the past, but is vague about the reason.  He admits to past charges of under age consumption of alcohol and riding a motorcycle without a helmet and then driving on a suspended license. Patient has no employment history.  Patient left school in the 11th grade...

MENTAL STATUS EXAMINATION
Patient is alert and oriented x3.  Fairly related.  Mood is euthymic. Affect is constricted.  Speech is normal in rate, tone and volume.  No delusions.  No auditory or visual hallucinations.  No suicidal or homicidal ideations or plan.  Thought process is mostly logical and goal directed.  Insight and judgment is fair.

DIAGNOSTIC IMPRESSION
Axis I: Attention Deficit Hyperactive Disorder, NOS
        R/O [rule out] Malingering
        Cannabis Abuse...GAF - 60-70

TREATMENT PLAN
Patient will be assessed in next interview along with counselor to see appropriate treatment for his symptoms.

Patient was asked if he would like to come back for his
next visit to get a more detailed history, as the history
he presented to me was different from what he had given
to the case manager.  Patient left the clinic without an
appointment.

(Tr. at 245-46.)

On March 28, 2005, F. Joseph Whelan, M.D., FMRS Health

Systems, Inc. Pharmacologic Management, reported that Claimant's

physician is Karen Hultman, D.O. and that Claimant

comes today for appointment.  He has been somewhat
preoccupied with having ADHD, although his mother who
came with him does not have that preoccupation...Patient
has a history of receiving psychiatric treatment
approximately two years ago, which he does not recall
now.  He apparently had a diagnosis in the past of
Adjustment Disorder with mixed features...Mental status
examination reveals a well developed well nourished 22
year old thin Caucasian male accompanied by his mother.
He was not suicidal, homicidal or psychotic...He seemed
to be well motivated toward treatment.

DIAGNOSTIC IMPRESSION
Axis I: Bipolar Disorder without psychotic features...
GAF - 30 current, for the year - 60.
Prognosis: Good with treatment.

TREATMENT PLAN
1) Case management and crisis intervention as indicated.
2) Treatment for Bipolar Disorder with continuing
Lamictal orange starter pack, Lexapro 10 mg. ½ pill for
three days then 1 pill daily.  Trileptal 150 mg. b.i.d.
[twice a day].
3) Will return in two weeks or as needed.

(Tr. at 243-44.)

On April 11, 2005, Dr. Whelan reported:

Patrick returns at this point claiming the medicine has
made him worse, more aggravated, more irritated and so on
so he quit the meds for five days.  He said he feels
better without these medications so I therefore told him
that we would not keep him on them.

26

Treatment Plan: Return p.r.n. [according to need] or as needed.

(Tr. at 242.)

On November 8, 2007, a State agency medical source completed a Psychiatric Review Technique form ["PRTF"] for the time period June 15, 2007 to present. (Tr. at 305-18.) The evaluator, Timothy Saar, Ph.D., licensed psychologist, marked that Claimant had no degree of limitation regarding restriction of activities of daily living and difficulties in maintaining social functioning, moderate degree of limitation regarding difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. (Tr. at 315.) He marked that evidence does not establish the presence of the "C" criteria. (Tr. at 316.) Dr. Saar noted: "Claimant did not return forms. ALJ Decision of 5/5/06 and [sic] given controlling weight. Evidence does not support severe limitations in F.C. [functional capacity] due to a mental impairment. Decision - RFC ["Residual Functional Capacity"] assessment necessary." (Tr. at 317.)

On November 8, 2007, Dr. Saar completed a Mental Residual Functional Capacity Assessment form. (Tr. at 319-21.) He marked that Claimant was not significantly limited in the ability to remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to

27

others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get alone with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. at 319-20.) He marked that Claimant was moderately limited in the ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id.

Dr. Saar concluded: "Clmt [claimant] is moderately limited as noted. Evidence does not support severe limitations in F.C. [functional capacity] due to a mental impairment. Clmt can learn and perform repetitive work-like activities." (Tr. at 321.)

On November 15, 2007, Dr. Saar stated in a form titled Case

28

Analysis: "I have reviewed the new ADL [activities of daily living] and they do not change the PRTF of 11/08/07.   Clmt appeared basically credible." (Tr. at 324.)

On April 30, 2008, a State agency medical source completed a mental status examination of Claimant.  (Tr. at 356-62.)   The evaluator, Misti Jones-Wheeler, M.S., a licensed psychologist, concluded:

MENTAL STATUS EXAMINATION: Appearance: Hazel eyes and dark brown hair with some facial hair.  He was casually dressed and wore cutoff pants and a T-shirt with no coat in 40-degree weather.  Attitude/Behavior: Cooperative. Speech: Speech was noted to be of normal tones, clear and concise.  Orientation: He was oriented x4.  Mood: Mood was depressed.  Affect: Affect was blunted.  Thought Processes: Stream of thought is within normal limits. Thought Content: No indication of hallucinations or illusions.  Insight: Fair.  Psychomotor Behavior: Within normal limits, as evidenced by clinical observation. Judgment: Moderately deficient, based on the claimant's answer to the "mail it" question. He stated that he would keep walking and not pick up the envelope. Suicidal/Homicidal Ideation: Absent.  Immediate Memory: Immediate memory is moderately deficient.  He immediately recalled two of four words.  Recent Memory: Recent memory was severely deficient.  He recalled zero of four words after a 30-minute delay.  Remote Memory: Remote memory was mildly deficient, based on some inability to recall details of his personal history.  It did not appear that the claimant put forth consistent effort to remember the words that were presented to him.  He did not appear to be motivated during the current examination. Concentration: Mildly deficient, based on some difficulties performing serial threes.  Persistence: Moderately impaired, based on behavioral observations during the examination.  Pace: Noted to be within normal limits, as observed during the examination.

Social Functioning: During the Evaluation: The claimant was noted to be somewhat distant and exhibited very little eye contact.  He showed no evidence of humor. Self-Reported: Mr. Settle reports having a couple of

29

friends and states that he enjoys fishing and goes
regularly.  He denies having other hobbies.

DAILY ACTIVITIES: Typical Day: Mr. Settle reports that
his arise and bedtimes vary.  He stated that he can do
most daily living skills.  He grooms independently and he
does the chores that his parents decide not to do.  He
does not shop with his parents, overall.  He stated that
it is "too hectic."  Activities List: The claimant stated
that he spends most of his day walking up and down the
road to keep from hurting.  He stated that it helps his
back to walk.

DIAGNOSTIC IMPRESSIONS (DSM-IV):
Axis I      311        Depressive disorder, not otherwise
                       specified
            305.2      Cannabis   abuse,   sustained,   full
                       remission

Axis II    V62.89      Borderline intellectual functioning,
                       by history

Axis III               Multiple   medical   problems (Per
                       claimant report)...

PROGNOSIS: Guarded.

CAPABILITY: This claimant might exhibit difficulties
managing his own finances.

(Tr. at 359-61.)

On May 10, 2008, a State agency medical source completed a

Psychiatric Review Technique form.   (Tr. at 363-76.)   The

evaluator, Debra Lilly, Ph.D., licensed psychologist, marked that

Claimant had a mild degree of limitation regarding restriction of

activities of daily living, and difficulties in maintaining social

functioning, moderate degree of limitation regarding difficulties

in maintaining concentration, persistence or pace, and no episodes

of decompensation, each of extended duration.  (Tr. at 373.)  She

30

marked that evidence does not establish the presence of the "C" criteria. (Tr. at 374.) Dr. Lilly noted:

> The ALJ decision in the record clearly should have controlling weight. It is very consistent with the findings in file at this time. The claimant's mental status reflect that he was inconsistent in his effort. One cannot have an impaired immediate memory and have moderate concentration issues. The CE notes that his persistence in tasks was impaired. He pays his own bills. The chart reflects that he seeks pain medications, but does not seek psychotropic medications. The claimant is not considered to be totally credible with regard to the severity of his mental health complaints.

(Tr. at 375.)

On May 10, 2008, Dr. Lilly completed a Mental Residual Functional Capacity Assessment form. (Tr. at 377-79.) She marked that Claimant was not significantly limited in the ability to remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately

31

to criticism from supervisors; get alone with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. at 377-78.)  She marked that Claimant was moderately limited in the ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods.  Id.

Dr. Lilly concluded: "The ALJ of 2006 is given controlling weight.  The claimant would be able to learn, recall, and perform simple, unskilled, work-like activities."  (Tr. at 379.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to give the opinions of treating physician Joan Worthington, D.O. significant and controlling weight; and (2) he was denied a fair hearing due to the conduct of the medical expert during the administrative hearing.  (Pl.'s Br. at 11-15.)

The Commissioner responds that the ALJ's decision is supported by substantial evidence because (1) the ALJ followed the controlling regulations in evaluating the opinions of Dr.

32

Worthington; and (2) the ALJ afforded Claimant a fair hearing.
(Def.'s Br. at 8-11.)

Evaluating the Opinions of Treating Sources

Claimant first asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to give the opinions of treating physician Joan Worthington, D.O. significant and controlling weight. (Pl.'s Br. at 11-13.) Specifically, Claimant argues:

> Dr. Worthington's medical assessment form stated that the plaintiff could not complete an eight (8) hour work day on a sustained basis. The ALJ relied heavily on the opinion of the medical expert witness to discredit the opinion of Dr. Worthington.

> The ALJ does not have the power to discount the functional conclusions of treating physicians on the basis that such conclusions are not supported by clinical findings because he does not "possess" any medical "expertise". Wilson v. Heckler, 743 F. 2d 218 (4th Cir. 1984)...

> If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6)...

> Due to the failure of the ALJ to provide controlling weight to the opinion of the plaintiff's treating physician regarding the plaintiff's functional capacity, without persuasive explanation, the ALJ's finding that the plaintiff can perform work at the medium exertional level with the above-described limitations is erroneous.

(Pl.'s Br. at 11-14.)

The Commissioner responds that the ALJ properly evaluated the opinions of Dr. Worthington. (Def.'s Br. at 8-11.) Specifically,

the Commissioner asserts:

> The ALJ followed the controlling regulations in evaluating Dr. Worthington's check-box assessment. Dr. Worthington's opinion was entitled to no special significance because it was on an issue reserved to the Commissioner, and was inconsistent and unsupported by the other objective medical findings.
>
> Contrary to Plaintiff's belief, the regulations empower an ALJ, not a claimant's physician, to determine whether a claimant is disabled as defined by the Act. 20 C.F.R. § 416.927(e)...
>
> Even if Dr. Worthington's opinion was entitled to any particular significance, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" Craig, 76 F. 3d 585, 590 (4th Cir. 1996)(quoting Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). It will be given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and it is "not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 416.927(d)(2),(e). Conversely, if the opinion does not meet that criteria, "it should be accorded significantly less weight." Craig, 76 F.3d at 590. The ALJ reasonably afforded less weight to Dr. Worthington's opinion of work-preclusive limitations in light of the persuasive evidence to the contrary.
>
> Dr. Worthington's assessment, which was in a check-box form and completed after examining Plaintiff on only two occasions, was undermined by the medical evidence. Specifically, laboratory testing indicated that Plaintiff had no significant disc degeneration (Tr. 53, 398), and physical examinations showed that Plaintiff had negative straight leg-raise testing and that his back had either full or 75% motion on several occasions (Tr. 232-33, 235, 246, 256-57, 385-86, 394-95).
>
> Further undermining Dr. Worthington's assessment of work-preclusive limitations was her statement in treatment notes that Plaintiff was "in no acute distress" (Tr. 385-86, 394-95). Dr. Worthington's clinical findings were also inconsistent with her assessments. For example, she assessed that Plaintiff's handling, feeling, seeing, and hearing were affected by the back impairments in the check-box for (Tr. 391). Yet nowhere in the notes of her

34

limited examination of Plaintiff is there mention of any
such problems (Tr. 385-86, 394-95).

Dr. Worthington's opinion was also inconsistent with the
other opinions in the record (Tr. 53, 339-55).   Drs.
Lambrechts and Boukhemis, state agency physicians deemed
experts in evaluating disability claims, opined that
despite Plaintiff's limitations, he could perform medium
work (Tr. 339-55).   Dr. Marshall also opined that
Plaintiff could perform medium work (Tr. 58).   Dr.
Marshall found that Plaintiff's most recent MRI showed
"nothing of any significance" (Tr. 53).   Noting the
absence of any clinical finding showing Plaintiff had
problems seeing, hearing, reaching, or feeling, Dr.
Marshall testified that he believed Dr. Worthington's
residual functional capacity assessment was "severely
exaggerated" (Tr. 57).

(Def.'s Br. at 8-10.)

In evaluating the opinions of treating sources, the
Commissioner generally must give more weight to the opinion of a
treating physician because the physician is often most able to
provide "a detailed, longitudinal picture" of a claimant's alleged
disability.   See 20 C.F.R. § 404.1527(d)(2) (2006).   Nevertheless,
a treating physician's opinion is afforded "controlling weight only
if two conditions are met: (1) that it is supported by clinical and
laboratory diagnostic techniques and (2) that it is not
inconsistent with other substantial evidence."   Ward v. Chater, 924
F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §
404.1527(d)(2) (2006).   The opinion of a treating physician must be
weighed against the record as a whole when determining eligibility
for benefits.   20 C.F.R. §§ 404.1527(d)(2) (2000).   Ultimately, it
is the responsibility of the Commissioner, not the court to review

35

the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527 (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner. Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Section 404.1527(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 404.1527(d)(2)(ii), the more knowledge a treating source

36

has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 404.1527(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The ALJ wrote a substantial decision wherein he fully considered the evidence of record, including that of treating physician Dr. Worthington.   (Tr. at 16-32.)   Regarding Dr. Worthington's opinions, the ALJ found:

> The claimant testified to extreme symptoms and limitations...He has been a patient at New River Clinic for 18 years, and he has been seeing Dr. Worthington for a year or so...
>
> On June 18, 2008, Joan Worthington, D.O., the claimant's treating physician, opined the claimant is limited to lifting no more than 10 to 15 pounds (Exhibit B-17F). She opined the claimant can lift and carry 15 pounds frequently.  She stated he can stand and/or walk two hours total during an eight-hour workday, 45 minutes without interruption.  She stated he can sit one to two hours total during an eight-hour workday, 20 minutes without interruption.  She opined he can occasionally kneel but can never climb, balance, stoop, crouch or crawl.  Dr. Worthington opined the claimant has limited ability to reach, handle, feel, see and hear.  Dr. Worthington further opined the claimant must avoid heights and moving machinery (Exhibit B-19F).  The opinions of Dr. Worthington are entitled to little weight as they are not supported by the objective evidence of record, including Dr. Worthington's own treatment notes, nor by the claimant's daily activities.

Robert Marshall, M.D., a medical expert, reviewed the evidence of record and testified the claimant's MRI revealed bilateral spondylolysis but nothing significant. The claimant's spine has slight degenerative changes. He complains of back pain and has been given medication. Dr. Hultman dismissed the claimant from his practice due to drug-seeking behavior. In April 2005, the claimant had full range of motion and straight leg raising was 90 degrees bilaterally. In March 2004, Dr. Bhirud examined the claimant, and the examination was essentially normal. X-rays of the lumbar spine were normal. A CT scan of the brain provided no objective findings. At one stage of a brain MRI, there were little lesions, which can be caused by something other than multiple sclerosis. If not multiple sclerosis, these lesions will cause no problems as they are not in the areas of the brain involving motor or sensory function. Occasionally, people with migraine headaches get these tiny spots. Dr. Marshall testified there is little to nothing clinically to support a diagnosis of multiple sclerosis. The claimant has been treated at New River Health Clinic for low back pain and headaches. He is not longer prescribed narcotics nor does he need any. In September 2008, the claimant was diagnosed with low back strain or sprain. Dr. Marshall opined the residual functional capacity by Dr. Worthington is severely exaggerated as it is inconsistent with the benign reports in the record. Dr. Marshall opined the claimant is limited to medium exertional activity due to backache based on his treating source diagnosis. Dr. Marshall opined there is no reason to limit postural activities. The claimant's optic nerves are perfectly normal, and there is nothing to suggest a neurological disorder. Migraine headaches are caused by basal spasms. The lesions are not of any significance, and they are not thought to be active. Dr. Marshall opined the claimant should get the follow-up MRI to be certain. There is no measurement of scoliosis in the record. The opinions of Dr. Marshall are entitled to significant weight as they are supported by the objective and credible evidence of record.

(Tr. at 24-25, 29.)

The undersigned has thoroughly reviewed all the records from Dr. Worthington and finds that the ALJ correctly concluded that her opinions were entitled to little weight. As stated earlier, a

38

treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2005). Here, Dr. Worthington's suggested total disability due to "chronic low back pain" is not supported by the objective evidence of record and is based on short term treatment of less than four months. (Tr. at 382-86, 389-92.)

20 C.F.R. § 404.1527(d)(2) requires the ALJ to "give good reasons" for not affording controlling weight to a treating physician's opinion in a disability determination. The "treating source rule" requires the ALJ to give the opinion of a treating source "controlling weight" if he/she finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If a treating source opinion is not afforded controlling weight because it does not meet these criteria, the ALJ must then determine what, if any, weight to give the opinion by examining several regulatory factors (e.g., length of the treatment relationship). Id.

Here, the ALJ has provided "good reasons" for not giving controlling weight to Dr. Worthington's statement of total

disability, i.e. her opinion is not supported by the objective evidence of record and is based on short term treatment of less than four months. (Tr. at 29, 382-86, 389-92.)   In fact, on his first office visit with Dr. Worthington on February 25, 2008, she notes that Claimant is "[N]ot taking any meds at this time...In no acute distress." (Tr. at 386.)  Then, at the apparent second office visit with Dr. Worthington, on June 18, 2008, Claimant asks her to fill out two physical exam forms for his applications for Social Security benefits and she again notes that Claimant is "[I]n no acute distress."  (Tr. at 385.)

The court **FINDS** the ALJ properly evaluated the claim and weighed the evidence of treating physician Dr. Worthington under 20 C.F.R. §§ 404.1512(e) and 404.1527(d)(2) and the applicable regulations.

Fair Hearing

Claimant next argues that he was denied a fair hearing due to the conduct of the medical expert during the administrative hearing. (Pl.'s Br. at 14-15.)  Specifically, Claimant argues:

> Medical experts are employed by the Office of Disability Adjudication and Review to provide impartial expert opinions at the hearing level. HALLEX I-2-5-32.  The relative weight that the ALJ gives to a claimant's medical records versus expert witness testimony is within the ALJ's discretion. Chambliss v. Massanari, 269 F.3rd 520 (5th Cir. 2001).

> However, it is the ALJ's duty to elicit useful and objective testimony from the medical expert. HALLEX I-2-5-39(A).  The Office of Disability Adjudication and Review has a policy that prohibits a medical expert from

unsupervised questioning of a Claimant or performing an examination of a claimant.  HALLEX I-2-5-36(A).

In the second copy of the audio recording of the plaintiff's September 25, 2008, hearing, received by the plaintiff, the medical expert testified that the claimant's treating physician, Joan Worthington, D.O. had submitted a report (Exhibit B-17F) that severely exaggerated the plaintiff's limitations in his ability to do work-related activities.  The medical expert went on to say that the report was "dishonest" and asked the claimant to stand and turn around so he could presumably examine the plaintiff's back which he is not permitted to do so.  He was stopped by the ALJ from continuing in this impermissible conduct.

The ALJ later found in her decision that the opinion of Dr. Worthington to be entitled to little weight and the opinions of the medical expert were entitled to significant weight.

The plaintiff believes that he is entitled to a hearing free from the prejudicial effect of the statements and the conduct of the medical expert at his hearing and should be provided a new hearing with a different ALJ and medical expert witness.

(Tr. at 14.)

The Commissioner responds that the ALJ's decision is supported by substantial evidence because the ALJ afforded Claimant a fair hearing.  (Def.'s Br. at 8-11.)  Specifically, the Commissioner asserts:

Plaintiff alleges that because of the testimony of Medical Expert Dr. Marshall, he was not afforded a fair hearing (Pl.'s Br. at 14).  Plaintiff, however, has proffered no evidence suggesting that bias or prejudice prevented the ALJ from properly adjudicating his case. See 20 C.F.R. § 404.940 (explaining that an ALJ may not conduct a hearing if he is "prejudiced or partial with respect to any party or has any interest in the matter"). Because the evidence shows that the ALJ afforded Plaintiff a fair hearing and his decision is supported by substantial evidence, Plaintiff's right to due process

41

was not violated.  See <u>Johnson v. Mississippi</u>, 403 U.S. 212, 216 (1971).

In assessing a claim of bias, the court presumes "that the hearing officer is unbiased." <u>Schweiker v. McClure</u>, 456 U.S. 188, 195 (1982).  This presumption is overcome only if the plaintiff demonstrates that the ALJ "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." <u>Liteky v. United States</u>, 510 U. S. 540, 556 (1994).

The only evidence Plaintiff proffers to support his claim that the ALJ was biased was the medical expert's testimony.  But this testimony was not improper.  Nothing prohibits a medical expert from giving his opinion about another physician's assessment.  Further, Dr. Marshall never examined Plaintiff (Tr. 63).  He stopped himself from doing so before Plaintiff stood up, stating, "I'm not allowed to examine him" (Tr. 63).  Dr. Marshall, therefore, engaged in no impermissible conduct.

Plaintiff's argument essentially asks this Court to discredit the opinion of Dr. Marshall because it was not in Plaintiff's favor.  He has, however, failed to overcome the presumption that the ALJ was an unbiased decision maker.  Because the ALJ's decision was supported by substantial evidence, this Court should affirm that decision.

(Def.'s Br. at 10-11.)

The court has fully reviewed the hearing transcript from September 25, 2008 and the ALJ's decision of December 1, 2008.  Tr. at 16-32, 33-71.)   The court finds that the conclusions drawn by the ALJ are reasonable, and the court can find no material misstatement by the ALJ in her findings demonstrating a personal bias against Claimant or that the testimony of the medical expert Dr. Marshall, was mishandled by the ALJ in any way.  In fact, Claimant admits that the ALJ advised Dr. Marshall of the inappropriateness of Dr. Marshall's suggestion that he examine the

Claimant. (Pl.'s Br. at 14.)  Further, the transcript shows that Dr. Marshall testified: "I'm not allowed to examine him." (Tr. at 63.)  At which time, the ALJ admonished him by stating: "Well, Dr. Marshall you shouldn't be." Id.  It is further noted that the ALJ later stated to Dr. Marshall during his testimony: "Well, Dr. Marshall, let's be a little kinder than that." (Tr. at 67.)

The court finds that the ALJ properly weighed Claimant's subjective complaints of pain and properly assessed Claimant's credibility and the combination of his impairments, in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that her findings are supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Claimant has failed to overcome the presumption that the ALJ was an unbiased decision maker.  Further, it is Claimant's responsibility to prove to the Commissioner that he or she is disabled.  20 C.F.R. § 416.912(a) (2006).  Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment.  Id. § 416.912(c).  In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first

43

>        must bear the burden . . . of showing that . . . he has
>        a medically severe impairment or combination of
>        impairments . . . . If the process ends at step two, the
>        burden of proof never shifts to the Secretary. . . . It
>        is not unreasonable to require the claimant, who is in a
>        better position to provide information about his own
>        medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

The court **FINDS** the ALJ properly evaluated the claim and weighed the medical evidence and provided Claimant with a fair hearing. The conduct of the medical expert at the hearing did not have a prejudicial effect upon the ALJ's review of the evidence.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

44

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: July 11, 2011

*Mary E. Stanley*

Mary E. Stanley
United States Magistrate Judge